HIXON *et al. v.* MYERS, administrator.

1. Where, on the trial of an issue as to the mental capacity of a grantor to execute a deed, a non-expert witness testified that she was the daughter of the grantor and had conversed with him and heard him talk with others, and had observed his conduct towards herself as well as towards others, it was competent for her as a non-expert witness to testify to the effect that the mind of the grantor was unsound.

2. A ground of a motion for new trial based upon the admission of evidence should state what objection was made thereto when it was offered at the trial, and should affirmatively show that the objection was then urged; otherwise no question is raised for determination. Under this rule the assignment of error based on a ground of the motion for new trial complaining of a ruling in admitting certain evidence can not be considered.

3. The controlling question is whether at the time of executing the deed the grantor had sufficient mental capacity to contract, and whether he was induced thereto by undue influence upon the part of the grantees. The evidence was insufficient to authorize the jury to find a want of mental capacity or the exercise of undue influence upon the grantor. It was erroneous, therefore, to charge upon that subject, and, after a verdict for the plaintiff, to refuse to grant the defendants a new trial on account of the error in the charge and the want of evidence to support the verdict.

DECEMBER 17, 1915.

Equitable petition. Before Judge Wright. Walker superior court. October 22, 1914.

On the 8th day of October, 1909, a deed was executed, the caption of which recited that it was made by James Hixon as party of the first part, and John B. Hixon and William Hixon, sons of the grantor, as parties of the second part. It proceeded as follows: "Witnesseth that the said party of the first part, for and in consideration of the sum of three thousand dollars and natural love

and affection in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, and conveyed, and by these presents doth grant, bargain, sell, and convey unto the said parties of the second part, their heirs and assigns [then follows a description of specified land]. Said land is deeded to my sons in the following proportions and manner: to my son William Hixon two thirds interest, and to my son John B. Hixon one third interest. This deed is made in consideration of the natural love and affection I have and bear to my said sons, and is valued at three thousand dollars ($3000.00). In the event my son John B. Hixon should die without issue or heir or heirs, then and in that event the third interest is to vest and revert in my son James T. Hixon and William Hixon equally. But, however, a lifetime interest is reserved to me in said land, and at my death the title vests absolutely in fee simple in them without any reservation whatever. To have and to hold the said bargained premises, together with all and singular the rights, members, and appurtenances thereof to the same being, belonging, or in anywise appertaining, to the only proper use, benefit, and behoof of them the said parties of the second part, their heirs and assigns, forever in fee simple." Then follows a general warranty of title. It was attested by three witnesses, one of whom was the clerk of the superior court. In July, 1910, the grantor died at the age of seventy-eight years, leaving as his heirs at law John B. Hixon, William Hixon, James T. Hixon, Mrs. Mary Milligan, and Mrs. Caroline E. Ware, who were his children, and two grandchildren, Mary and Alice Coulter, both children of Mrs. Rebecca Coulter, a daughter of the deceased, who had died before him. Upon the death of James Hixon, John B. and William Hixon took possession of the land described in the above mentioned deed. Shortly thereafter John B. Hixon died, leaving no wife or child; whereupon James T. Hixon took possession jointly with William Hixon, claiming under the terms of the deed, and thereafter retained possession of the land, which was of a stated value. W. W. S. Myers was appointed administrator of the estate of James Hixon, and J. M. Jackson was appointed administrator of the estate of John B. Hixon. Subsequently Myers as administrator instituted an action against William Hixon, James T. Hixon, and J. M. Jackson as administrator, in which it was sought to set aside the deed and recover the land

described therein, and mesne profits, and also a certain amount of money alleged to have been left by James Hixon and appropriated by the defendants. The grounds upon which it was sought to set aside the deed were: (1) At the time the deed was signed the grantor was mentally incapable of executing such an instrument. (2) The grantor was induced to execute the deed by undue influence exercised over him by James T. Hixon. (3) There was no valuable consideration paid or promised by either of the grantees, and the deed was never delivered, but was retained by James Hixon, who intended that the deed should have no force or operation until his death, and he remained in possession until his death. On the trial the jury returned a verdict finding for the plaintiff, setting aside the deed and awarding a stated sum as mesne profits, but finding for the defendants on the issue as to the conversion of money left on hand by the plaintiffs' intestate. The defendants made a motion for new trial, on the general grounds, and on others assigning error upon excerpts from the charge to the jury, and upon rulings on the admissibility of evidence. The motion was overruled, and the defendants excepted. Other facts sufficiently appear in the opinion.

*W. H. Payne, H. P. Lumpkin,* and *R. M. W. Glenn,* for plaintiffs in error. .

*W. M. Henry, F. W. Copeland,* and *J. E. Rosser,* contra.

ATKINSON, J. 1. While being examined as a witness for the plaintiff, the following question was propounded to Mrs. Mary T. Milligan: "From what you saw then and heard, these things you have told and that you saw and heard, did you believe he was sane, that his mind was normal, and that he knew all about what he was doing and wanted to do at the time; or was his mind off?" The answer was, "He was off." This was objected to on the ground that it was incompetent, because the witness, a non-expert, had not been asked any questions which would form the basis of any opinion as to the sanity of insanity of the grantor. The testimony was delivered in connection with other testimony of the witness, to the effect that she was a daughter of the grantor, and shortly before and after execution of the deed she had seen and heard him talk, and had engaged in conversation with him and observed his conduct towards herself and others. It was competent, in connection with such other testimony, for the witness to give the testimony objected

to. *Strickland* v. *State,* 137 *Ga.* 115 (4), 116 (72 S. E. 922), and citations.

2. Another ground of the motion complains of a ruling by which Dr. Crowder was permitted to give certain testimony; but this ground was insufficient to present any question for decision, because it failed to state what objection was urged to the admissibility of the evidence before the judge at the time it was admitted. *Hill* v. *Chastain,* 138 *Ga.* 750 (75 S. E. 1130).

3. The remaining grounds of the motion complain of the charge of the court on the subjects of mental capacity to make a deed and fraud and undue influence exercised over the grantor, inducing execution of the deed. We are of the opinion that the evidence was insufficient to authorize the jury to find that the grantor was without mental capacity to make the deed, or that any undue influence was exercised over him to induce execution of the deed. Under this view, the evidence did not authorize the submission of such questions to the jury. It is unnecessary to say more concerning the assignments of error based on exceptions to the charge. From the statements just made, it will be observed that the controlling question is upon the general grounds of the motion for new trial. Former decisions of this court settle the law applicable to the facts of this case on the subject of mental capacity and undue influence sufficient to set aside a deed. *DeNieff* v. *Howell,* 138 *Ga.* 248 (5), 251 (75 S. E. 202) ; *Dunn* v. *Evans,* 139 *Ga.* 741 (78 S. E. 122) ; *Frizzell* v. *Reed,* 77 *Ga.* 724 (2) ; *Johnson* v. *Coleman,* 134 *Ga.* 696 (68 S. E. 480). In the latter case it was held: "Proof of weakness of mind not amounting to imbecility is not sufficient to warrant a jury in setting aside a contract, there being no proof of fraud or undue influence." See also the reasoning of McDonald, J., in *Causey* v. *Wiley,* 27 *Ga.* 444. It remains only to state the substance of so much of the evidence as will suffice to show the case as presented in the trial court. It affirmatively appeared, without any evidence to the contrary, that the grantor intended to execute the instrument as a deed, and that after signing it he delivered it as such. It was prepared by the clerk of the superior court under the directions of the grantor. His two sons, William and James T. Hixon, were present and knew of the plan to execute the deed, but there was no evidence that either of them exercised any influence whatever or did anything to induce the grantor to make the deed.

Each of them testified that they did not exercise any influence over the grantor. The other son, John B. Hixon, was absent, and there was no contention that he exercised any influence over the grantor. The children of the grantor had all grown up and lived separately from him. James T. Hixon resided in the same neighborhood, and the others more remotely. The relations with some of his children had not been pleasant. The deed was executed in pursuance of a plan to distribute his property among his children. The distribution was unequal, the property given to his sons being of greater value than that given to his daughters. The deed was executed on October 8, 1909, when the grantor was seventy-eight years of age and in feeble health. After execution of the deed the grantor gradually declined in health and died in July next ensuing. The above is sufficient to show that the evidence did not authorize the jury to set aside the deed on account of undue influence. But it was mainly contended that the grantor was of unsound mind and wanting in mental capacity to make a deed. All of the subscribing witnesses to the deed were examined upon the trial, and testified that the maker was apparently of sound mind. Some of the witnesses relied on by the plaintiff to show want of mental capacity of the grantor to make a deed were the grantor's daughter, Mrs. Mary T. Milligan, and her husband, and Dr. Clark, a nerve and brain specialist. Neither of these, nor any of the other witnesses for the plaintiff, testified that they were present at the time the deed was executed, or as to anything said or done by the grantor on the day of the execution of the deed, tending to show his state of mind. Mrs. Milligan testified that she lived in Alabama, and came to see the grantor in September before he died in July. He was then at his home in Walker County, Georgia, where he afterwards died. Witness had not seen the grantor for five years before that, and when she walked up the steps the grantor was "sitting there very feeble," and did not know witness. His complexion was unhealthy, and he did not appear to witness as he formerly did. Witness remained with him for several months. While witness was with him he mistook her for another person—a lady who was somewhat fleshy like herself. At times his mind "was clear about matters, and at times it was not." Witness was not there at the time the deed was executed. She was there a few days afterwards. She did not know the condition of her father's mind "on the day he

made this deed." She left the last day of February, and her father died the 28th day of July following. The grantor made witness a deed the same day he made the deed to her brothers. The deed was delivered to witness by her brothers after the death of her father. She went into possession under the deed and has held possession ever since, and continues to claim the property. Concerning this deed the witness testified: "I went into possession of the sixty acres of land under that deed my father made me. I was to get eighty acres on the Kilgore place, but it did not call for that; he told me so after that. My father told me he was going to give me sixty acres and then he was going to give me eighty acres, and then he made me a deed to it; he gave me a deed to the tract of sixty acres that I am in possession of now, and he gave me in the same deed eighty acres on the mountain, and I am in possession of it now." The witness further testified that her sister, Mrs. Coulter, died in the asylum, and that her brother John at one time was in the asylum, where he remained probably for a year or two, and that he died in Chattanooga Valley about eight months after his father died. M. Milligan, the husband of the above witness, testified to the following effect: He had known the grantor for approximately forty years. He was a very industrious man and "of more than average mind." In 1907, more than two years before the grantor died in 1910, witness spent the night with him, and he was in failing health. His complexion and eyes "were pale." The next time witness saw him was about the fifth or eighth of September, 1909. He was then sitting on the porch "in a very poor condition,—a great deal worse than in 1907." He said "he was likely to die" at any time. He could hardly get in and out of the door. Witness's wife was with him; and when they approached, the grantor did not know who they were. When they told him, "he remembered us." He did not talk a great deal. Before that he talked a great deal. He asked witness several questions about how he got there, and about the men in Summerville, and about who was the richest man in Summerville. He could not go out. Witness next saw him about the 25th of the month, at which time he did not talk and act as he had acted before. Witness thought then that his mind was wrong. On that occasion he told witness that his sons John and James were doing his business; and he said, "Mose, I have been thinking about deeding my property for six or seven years, from

the time John was sick once and likely to die," and he had decided not to do it,—thought it would be best to leave it open to all his heirs, though Jimmie wanted him to make some deeds disposing of it, as Jimmie thought he ought to have the advantage in what he had, and went on to say he had a house full of girls and had a considerable burden on him, etc. "And I says, 'The others have underwent their burdens,' and that's what he said,—that he had declined the idea of doing it. I don't think he was off his mind while I talked to him there. He seemed then to be getting weaker." Subsequently, on the 9th day of October, witness and his wife received a letter "telling us to come, that they thought he was dying; and we went over there, and he told me and my wife on the 11th, the next morning after we got there, what he had done, that he had deeded Jimmie the home place, . . and that he had deeded Mollie, that's my wife, and Alice Coulter the Kilgore place on the mountain there, and deeded my wife the eighty acres on the south half of the Kilgore place. The sixty acres that he actually deeded to my wife was a part of the Kilgore place, and when she got the deed after his death it was only sixty acres." Witness again saw the grantor about the last of October. The two went to Chattanooga together. Witness was with him two or three days at that time. They talked "about events or things in the neighborhood," and witness did not think his mind was right. The grantor told a man in Chattanooga that he wanted to buy a good bill of wire, but that he was not able to transact business, and if he got able he would return, and if not he would send his son Jimmie. Witness then took him back home. Witness again saw him about the 1st of December. His condition was still bad, and he seemed to be weaker and worse than before. Witness next saw him in January, and thereafter about once a month until shortly before his death. He seemed to get worse all the while. "In the light of all I saw of him and heard him say and saw him do, I don't think his mind was sound from the time I went up there in September until he died. I don't think it was sound. I know he did not talk like he used to." To the question, "Do you believe from those things that he would be able to have a clear understanding of a business transaction, or what he wanted to do, or the result of it, or whether it was right or wrong; that he would have a clear understanding of those things?" he answered: "I can hardly say; I

don't think he was [would], though." On cross-examination the witness testified, among other things: "I don't think my father in law was a plum idiot or crazy man when he gave that deed to my wife; from stating to me that he had given her eighty acres of the Kilgore place and it failed to be that way, I did not think he knew what he was doing. That is the reason I think he was not at himself. It was not like he said it was." It was after the deed was executed that he had the conversation in Chattanooga about the purchase of the wire. "On the 11th day of October after he made those deeds, I don't think he said anything to me about not giving Mrs. Ware anything, or giving her anything. He talked about it before that. I have told you what he said before; that he believed young Ware got his money from the way the dogs ran." He did not give Mrs. Ware any of his property before he died. Several years before he died he told witness that he was not going to give. Mrs. Ware anything. He was then in his right mind, and was mad because she "ran off and married." Dr. Clark testified that he first saw the grantor early in October, when he called to have his grandson treated. He could not give the exact date. He noticed that the grantor was highly nervous and showed symptoms which impressed the witness, causing him to form an opinion which was confirmed by a subsequent examination and diagnosis made by the doctor. The examination was two weeks later, October 29th, and showed that the patient had Bright's disease in its advanced stage, and had been afflicted with it some time, probably several years. The disease, especially in view of the grantor's advanced years, would tend to impair his mind, render his power of decision "out of balance," and his judgment incorrect and unjust. He would be easily influenced, and would readily assent to anything that might be said to him by persons nearly related or having friendly relations with him. The witness did not go so far as to state that the grantor was without mental capacity, or that he was without capacity to understand ordinary transactions; nor did he pretend to testify to the mental condition of the grantor at the time of signing the papers, further that to say, "His mental condition would be very uncertain on the 9th day of October, twenty days before I saw him. It is possible, but not probable, that it was all right then." The question was propounded: "Suppose Mr. Hixon had sent for a justice of the peace to draw these papers and had told him how

to draw the papers, and the justice of the peace himself was uncertain whether he could draw them in the manner in which he wanted them drawn or not; and then Mr. Hixon sent several miles and procured a man sufficiently able to draw these papers; what about that?" The answer was: "Any one might do that if he was acting upon his own resources, and no one else. If there was nothing else appearing, it would show that he had very good judgment indeed." There was uncontradicted evidence showing facts as stated in the above question.

Other witnesses were examined both by the plaintiff and defendants; and the testimony delivered by them was substantially to the effect that at the time of the execution of the deed, and prior thereto and afterwards, the grantor attended to business matters in the usual way, and his mind was apparently sound. The testimony of the defendants' witnesses bore more on the feeble condition of the grantor's health than upon his mental capacity. It would not be profitable to set out the testimony in greater detail. The foregoing sufficiently states the substance of it. From all of the testimony there is no direct or circumstantial evidence sufficient to authorize the jury to find that the grantor, at the time he executed the deed, did not have mental capacity to execute a contract. The most that could be said of the evidence, viewed in the most favorable light for the plaintiff, is that it might authorize a finding that the grantor was of weak or feeble mind. Under the authorities hereinabove cited, this alone would not be sufficient to set aside the deed on the ground of mental capacity. It has already been pointed out that it affirmatively appears that the deed was prepared under the immediate direction of the grantor, and that he was not coerced or influenced thereto by either of the defendants.

*Judgment reversed. All the Justices concur.*